IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| IN RE: | § | |
| --- | --- | --- |
| | § | |
| SA-ENC OPERATOR HOLDINGS, LLC | § | CASE NO. 15-50617 |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

| IN RE: | § | |
| --- | --- | --- |
| | § | |
| SA-ENC BLU FOUNTAIN, LLC | § | CASE NO. 15-50613 |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

| IN RE: | § | |
| --- | --- | --- |
| | § | |
| SA-ENC FORT MYERS, LLC | § | CASE NO. 15-50614 |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

| IN RE: | § | |
| --- | --- | --- |
| | § | |
| SA-ENC GLENNON PLACE ALF, LLC | § | CASE NO. 15-50615 |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

| IN RE: | § | |
| --- | --- | --- |
| | § | |
| SA-ENC GLENNON PLACE, LLC | § | CASE NO. 15-50616 |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

| IN RE: | § | |
| --- | --- | --- |
| | § | |
| SA-ENC PARK HAVEN, LLC | § | CASE NO. 15-50618 |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

| IN RE: | § | |
| --- | --- | --- |
| | § | |
| SA-ENC PH HOLDINGS, LLC | § | CASE NO. 15-50619 |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

| IN RE: | § | |
| --- | --- | --- |
| | § | |
| SA-ENC SUNRISE GP, LLC | § | CASE NO. 15-50620 |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

| IN RE: | § | |
| --- | --- | --- |
| | § | |
| SA-ENC TONGANOXIE, LLC | § | CASE NO. 15-50621 |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

| IN RE: | § | |
| --- | --- | --- |
| | § | |
| SA-ENC VIP MANOR, LLC | § | CASE NO. 15-50622 |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

**DECLARATION OF RAYMOND MULRY IN SUPPORT OF CERTAIN
FIRST DAY PLEADINGS RELATING TO THE ENCORE DEBTORS**

1. My name is Raymond Mulry. I am a Designated Officer of each of the following entities: SA-ENC Operator Holdings, LLC, SA-ENC Blu Fountain, LLC, SA-ENC Fort Myers, LLC, SA-ENC Glennon Place ALF, LLC, SA-ENC Glennon Place, LLC, SA-ENC Park Haven, LLC, SA-ENC PH Holdings, LLC, SA-ENC Sunrise GP, LLC, SA-ENC Tonganoxie, LLC, and SA-ENC VIP Manor, LLC (collectively, the "Encore Debtors"), the debtors-in-possession in the

above-captioned bankruptcy cases (collectively, the "Bankruptcy Cases"). I am also Associate General Counsel and Vice President – Corporate and Regulatory Affairs, of Health Care Navigator LLC. HCN provides administrative and other services to the Encore Debtors and their affiliates. In this capacity, I am generally familiar with the Encore Debtors' day-to-day operations, business and financial affairs, books and records.

2. Commencing on June 25, 2014 and periodically thereafter (as applicable, the "Petition Date"), New Louisiana Holdings, LLC and certain affiliated entities filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code").[1]

3. On May 20, 2015, the Encore Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

4. The Encore Debtors have requested various types of relief in their "first day" motions and applications (each, a "First Day Motion" or "Motion"). The First Day Motions seek relief intended to allow the Encore Debtors to: (a) administer their cases in an efficient manner, (b) preserve the value of certain ongoing operations, (c) ensure the safety and care of the residents in the skilled nursing facility (the "Facility") operated by SA-ENC Fort Myers, LLC ("Fort Myers"), and (d) perform and meet those obligations necessary to fulfill their duties as debtors-in-possession in the Bankruptcy Cases. I am familiar with the contents of each of the First Day Motions (including the exhibits thereto), and I believe that the relief sought in each of the First Day Motions: (a) is necessary to enable the applicable Debtor(s) to operate in Chapter 11 with minimal disruption or loss of productivity or value; (b) allow Fort Myers to maintain proper care and treatment of the residents in the Facility, (c) constitutes a critical element to

---

[1] All of the statutory references contained in this Declaration will be to the Bankruptcy Code, unless otherwise indicated.

---
**Declaration of Raymond Mulry in Support of Certain First Day Pleadings**                                        Page 3

15-50614 - #16  File 05/21/15  Enter 05/21/15 17:10:48  Main Document  Pg 3 of 16

achieving a successful reorganization of the applicable Debtor(s); and (d) best serves the Encore Debtors' estates and creditors' interests.

5.  I submit this Declaration in support of the First Day Motions. Except as otherwise indicated, all of the facts set forth herein are based upon my personal knowledge of the Encore Debtors, information learned from my review of relevant documents, or information supplied to me by other members of the Encore Debtors' management and the Encore Debtors' professionals. I am authorized to submit this Declaration on behalf of the Encore Debtors, and if called on to testify, I could and would testify competently to the facts set forth herein.

### I. THE ENCORE DEBTORS' BUSINESS AND OPERATIONS

**A.  Overview of the Encore Debtors' Business**

6.  The Encore Debtors were formed for the purpose of acquiring the operations (collectively, the "Operations") of skilled nursing facilities in Illinois, Texas, Kansas, Missouri and Florida (collectively, the "Facilities"). As discussed in more detail below, prior to the Petition, all of the Operations other than those of Fort Myers were transferred to third parties in a series of transactions that occurred in 2014.[2]

7.  Fort Myers is the licensed operator of the Facility, a skilled nursing facility with 120 licensed beds in Fort Myers, Florida.

8.  Fort Myers does not own the Facility, but rather leases it from SA-ENC Master Tenant, LLC, pursuant to a sublease agreement, dated as of January 1, 2007 (the "Facility Lease").[3] Fort Myers is also a party to a management services agreement with CHG Legacy Group, LLC f/k/a Cypress Health Group, LLC ("CHG"), as assignee of Cypress Health Care

---
[2] SA-ENC Sunrise, LLC previously operated a 119 bed facility in San Antonio, Texas; SA-ENC VIP Manor, LLC previously operated a 106 bed facility in Woods River, Illinois; SA-ENC Glennon Place, LLC previously operated a 120 bed facility in Kansas City, Missouri; SA-ENC Tonganoxie, LLC previously operated a 90 bed facility in Tonganoxie, Kansas; SA-ENC Blu Fountain, LLC previously operated a 68 bed facility in Godfrey, Illinois; and SA-ENC Park Haven, LLC previously operated a 101 bed facility in Smithton, Illinois.
[3] In turn, SA-ENC Master Tenant, LLC leases the Facility from Encore Cypress LLC and Encore Sunrise LP.

---
**Declaration of Raymond Mulry in Support of Certain First Day Pleadings**             Page 4

Management Region III, LLC, for the management of the Facility. CHG has sub-contracted with Gulf Coast Health Care, LLC ("Gulf Coast") to provide substantially all of the services to be provided by CHG to the Facilities under the service agreements. As a result, Gulf Coast currently provides management services to the Facility.

9. A chart setting forth the corporate structure of the Encore Debtors is attached hereto as **Exhibit A**.

B. **Prepetition Debt Structure**

10. The Encore Debtors and Encore Nursing Center Partners Limited Partnership-85 (the "Prepetition Lender") are parties to that certain Loan and Security Agreement, dated January 1, 2007 (as amended or supplemented thereafter, the "Prepetition Loan Agreement"), pursuant to which the Prepetition Lender agreed to make available to the Encore Debtors a revolving line of credit (the "Loan"). The Loan was evidenced by a Promissory Note, dated January 1, 2007, as amended by that certain First, Second, Third and Fourth Allonge to Promissory Note dated as of January 23, 2008, May 6, 2008, August 19, 2008 and December 31, 2008, respectively, in the principal amount of $5,378,000 (the "Note" and, together with the Prepetition Loan Agreement and any related documents, the "Prepetition Loan Documents"), executed by the Encore Debtors in favor of the Prepetition Lender.

11. In connection with the Loan and the Note, the Encore Debtors granted to the Prepetition Lender a continuing security interest in and lien (the "Prepetition Senior Liens") on all or substantially all of the Encore Debtors' assets, including the following: (i) all tangible personal property, including, without limitation all present and future inventory and equipment; (ii) all accounts, payment intangibles, instruments and other rights to receive payments; (iii) all general intangibles, chattel paper, documents, supporting obligations, letter of credit rights, investment property, rights, remedies, guarantees and collateral evidencing, securing or

otherwise relating to the foregoing; (iv) all lockboxes, all and other deposit accounts into which any of the collections on any of the foregoing are deposited; (v) all books and records related to the foregoing; (vi) all information and data compiled or derived by the Encore Debtors with respect to the foregoing; and (vii) any all proceeds and products of the foregoing (collectively, the "Collateral").

12. The Prepetition Lender made loans and advances to the Encore Debtors in a maximum principal amount of up to $5.378 million, pursuant to the terms and conditions set forth in the Prepetition Loan Documents. Beginning in 2008 and continuing at various times thereafter, certain Events of Default (as defined in the Prepetition Loan Documents) occurred, and the parties entered into various alonges to the Note.

13. Additionally, the Encore Debtors and the Prepetition Lender entered into a Forbearance Agreement, dated as of December 31, 2008 (the "Forbearance Agreement"), pursuant to which, inter alia, the parties agreed, subject to the terms and conditions of the Forbearance Agreement, that the Prepetition Lender would forbear from exercising any remedies until February 28, 2009. The parties further agreed that upon the termination of the forbearance period on February 28, 2009, and a failure of the Encore Debtors to reduce the outstanding principal balance on the Note to $1,378,000, the indebtedness due under the Note would be due and payable in full and the Prepetition Lender would be able to exercise any remedies to which it was entitled under the Prepetition Loan Documents.

14. The Encore Debtors failed to reduce the principal amount of the Note as required by the Forbearance Agreement, and the Note became due and payable no later than March 1, 2009.

_____
**Declaration of Raymond Mulry in Support of Certain First Day Pleadings**        **Page 6**

15-50614 - #16  File 05/21/15  Enter 05/21/15 17:10:48  Main Document  Pg 6 of 16

15. As of the Petition Date, the Prepetition Lender had not commenced any action to recover the sums allegedly due under the Note.

## II. EVENTS LEADING TO THE ENCORE DEBTORS' BANKRUPTCY

**A.   Historical Operating History**

16. The Operations of the Facilities have been adversely affected by a number of factors, including, but not limited to, the following: (i) demographics that negatively impacted both the target population for potential residents as well as staff; (ii) sub-prime and/or deteriorating physical conditions of certain of the Facilities, and associated maintenance and repair costs; (iii) significant delays in the remittance of Medicaid receivables in Illinois; and (iv) the number of threatened and pending personal injury litigation claims asserted against the Encore Debtors. All of the foregoing had a negative impact on the Operations of the Facilities.

**B.   Defaults Under Prepetition Loan Documents and Fort Myers Lease**

17. The poor operating performance of the Facilities resulted in certain defaults in the Prepetition Loan Agreement, including the failure to pay the Note when it matured in early 2009. Similarly, as of the Petition Date, Fort Myers is in arrears to the landlord under the Facility Lease.

**C.   Need to Transfer the Operations**

18. As a result of ongoing losses at the Facilities and other factors, in or around 2013 the Encore Debtors determined that it was no longer prudent to continue to operate the Facilities. As a result, beginning in January 2014 and periodically thereafter, the Encore Debtors entered into various Operations Transfer Agreements (the "Transfer Agreements") with third parties that provided for a transfer of the Operations. With the exception of Fort Myers, all of the Encore Debtors' Operations were transferred to unrelated new operators in 2014.

### D. Dispute Regarding Transfer of Fort Myers' Operations

19. On or about May 23, 2014, Fort Myers and Stesel Enterprises, LLC ("Stesel") entered into an Operations Transfer Agreement (the "Fort Myers Transfer Agreement"), pursuant to which Fort Myers agreed to transfer operations of the Facility to Stesel or its assignee upon the closing of the sale of the Facility and associated real estate by Encore Cypress, LLC ("Landlord") to Stesel under a separate agreement. The closing on the sale of the Facility did not take place due to, among other things, the failure to satisfy certain conditions precedent, and, consequently, the transactions contemplated by the Fort Myers Transfer Agreement did not occur. In the intervening time period, Fort Myers made significant improvements to the Facility and incurred other costs and expenses as a result of its continued operation of the Facility.

20. On or about April 13, 2015, Landlord's secured lender, Highland Park COD I, Ltd. ("Highland") filed suit against Landlord, Encore Sunrise LP, SA-ENC Master Tenant, LLC, and Fort Myers, seeking to foreclose on the Facility and compel Fort Meyers to execute an amendment to the Fort Myers Transfer Agreement, among other things (the "State Court Litigation"). Highland has also sought the appointment of a receiver for Landlord, and requested certain other relief. A hearing on Highland's request to appoint a receiver is currently scheduled for May 26, 2015.

21. Prior to the Petition Date, Fort Myers engaged in negotiations with Stesel, Landlord and Highland in an attempt to reach an agreement on the terms by which Fort Myers would transfer its operations to Stesel. While those discussions are ongoing, and Fort Myers remains hopeful that an agreement can be reached among those parties that can be presented to the Court for approval, it became clear that the best way to preserve the value of Fort Myers' assets and implement a transfer of its operations was through a voluntary Chapter 11 case.

___

**Declaration of Raymond Mulry in Support of Certain First Day Pleadings**             **Page 8**

## III. THE DEBTORS' FIRST DAY MOTIONS

A.  Introduction

22. In order to facilitate the transition into bankruptcy and minimize the adverse effects of the commencement of the Bankruptcy Cases on their businesses, the Encore Debtors have requested various types of relief in the First Day Motions, all of which are being filed concurrently with this Declaration. I submit this Declaration in support of the following First Day Motions filed by the Encore Debtors:

   a. Emergency Motion for Authority to Maintain Existing Bank Accounts and Cash Management System and Waive Requirements of Section 345(b) of the Bankruptcy Code (the "Bank Account Motion");

   b. Emergency Motion for Interim and Final Orders Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices, and Determining Adequate Assurance of Payment for Utility Services (the "Utility Motion");

   c. Emergency Motion for Authority to Pay Pre-Petition Employee Wages, Compensation and Employee Benefits (the "Wage Motion");

   d. Motion for an Order Directing the Joint Administration of Chapter 11 Cases (the "Joint Administration Motion"); and

   e. Emergency Motion for Interim and Final Orders Authorizing the Debtors to Use Cash Collateral and to Provide Adequate Protection (the "Cash Collateral Motion"); and

23. I have reviewed each of the First Day Motions (including the exhibits and schedules thereto). The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the relief sought in each of the First Day Motions: (a) is necessary to enable Fort Myers to operate in Chapter 11 with minimal disruption to the Facility; (b) will ensure the safety and care of the residents of the Facility; and (c) constitutes a critical element in achieving a successful reorganization of the Encore Debtors.

___

**Declaration of Raymond Mulry in Support of Certain First Day Pleadings**                                              Page 9

15-50614 - #16   File 05/21/15   Enter 05/21/15 17:10:48   Main Document   Pg 9 of 16

### B. The Bank Account Motion

24. The Encore Debtors maintain bank accounts at Bank of America which are designed to receive, among other payments, Medicare, Medicaid and other government receivables (the "<u>Bank Accounts</u>"). The Bank Accounts are also utilized to process ACH debits to cover the payroll for their employees, which are made by direct deposit to the employees. I am informed that if the Encore Debtors close the Bank Accounts, there will be an approximately six to eight week delay in connecting Medicare and other government payments to a new debtor-in-possession bank account. The Encore Debtors rely on these government payments to fund their business operations, and cannot meet their ongoing payment obligations without these payments. If the Encore Debtors are forced to close the Bank Accounts and open new debtor-in-possession accounts, the attendant delay in receipt of government payments would be extremely harmful to its business operations and the Encore Debtors' reorganization, as Encore Debtors would not have the funds necessary to pay their post-petition operating expenses and Fort Meyers would not have the funds necessary to pay its employees. Furthermore, requiring the Encore Debtors to close the Bank Accounts and open other payroll accounts would delay payment of payroll to Fort Meyers' employees, which is scheduled to occur on June 2, 2015. Consequently, the Encore Debtors are requesting the waiver of the requirement that they close their existing Bank Accounts so that they may maintain the existing Bank Accounts as their debtor-in-possession accounts.

### C. The Utility Motion

25. In the ordinary course of business, Fort Myers uses gas, water, electric, telephone, and other utility services provided by various utility providers (collectively the "<u>Utilities</u>"). A list identifying each Utility currently providing service to the Facility is attached to the Utility Motion as **Exhibit A**. As with most businesses, uninterrupted utility services is critical to Fort

___

**Declaration of Raymond Mulry in Support of Certain First Day Pleadings**     Page 10

15-50614 - #16   File 05/21/15   Enter 05/21/15 17:10:48   Main Document   Pg 10 of 16

Myers' ability to maintain its ongoing operations. Termination of services by the Utilities would effectively preclude Fort Myers from operating, resulting in lost revenue and significant harm to its estate. Fort Myers is contacting each of the Utilities to discuss their request for adequate assurance of payment. As adequate assurance of payment under Section 366(b) for each Utility requesting it, Fort Myers proposes to place a deposit with each Utility that doesn't already have such security in an amount equal to thirty days' average billing based on the average monthly billing over the previous 12 months. The amount of the proposed deposit for each Utility is set forth on **Exhibit A** to the Utility Motion. Under the procedures set forth in the Utility Motion, in the event that Fort Myers and a Utility are unable to reach an agreement regarding adequate assurance of payment, the Court will resolve such dispute at a final hearing to be held on or before June 9, 2015. Fort Myers will remain current on billing for all post-petition services provided by the Utilities. I believe that the relief requested in the Utility Motion will adequately assure the Utilities of payment for post-petition utility service.

D.     **The Wage Motion**

26.     To maintain the continuity of the business operations, to ensure that residents are properly cared for, and to preserve the morale of Fort Myers' employees, it is important that Fort Myers be permitted to honor and pay the Pre-Petition Employee Obligations (as that term is defined in the Wage Motion) at their discretion in the ordinary course of business. The continued loyalty of a debtor's employees is a necessary component to any successful Chapter 11 case. The filing of a Chapter 11 petition is a stressful and uncertain time for a debtor's employees and such stress and uncertainty often cause poor employee morale at a time when a debtor needs its employees to be most loyal. If employees do not receive payment for work performed pre-petition, it is likely that Fort Myers will lose employees with little or no notice. Moreover, many of Fort Myers' employees live paycheck to paycheck and would suffer severe

___

**Declaration of Raymond Mulry in Support of Certain First Day Pleadings**                                                          Page 11

15-50614 - #16  File 05/21/15  Enter 05/21/15 17:10:48  Main Document  Pg 11 of 16

adverse consequences if they failed to receive their full compensation. Likewise Fort Myers would suffer immediate and irreparable harm as a result of any resulting loss of morale, exodus of employees, and disruption to its operations. Paying the Pre-Petition Employee Obligations will minimize the hardship that employees will certainly endure if payroll is interrupted and will prevent the wholesale loss of employees that would ensue if the employees lost the reasonable expectation that they will be paid for their work.

27. As a result, payment of the Pre-Petition Employee Obligations is necessary to prevent the risk of damage to Fort Myers' estate, which would adversely affect all parties in interest. In this case, the continued services and cooperation of Fort Myers' employees is integral and necessary to operating the Facility and providing care for its patients. If Fort Myers is unable to assure its employees that they will be paid timely, or if employees are not assured of uninterrupted, critical payments to which they are entitled, Fort Myers' post-petition operations would be seriously jeopardized due to employee resentment, resignations, loss of good will and disruption of employee morale. Fort Myers has not identified a practical or legal alternative to payment of the Pre-Petition Employee Obligations that would not result in a loss of employees or other disruption of its business.

28. Accordingly, in the exercise of my business judgment I believe that it is in the best interest of Fort Myers' estate to pay the Pre-Petition Employee Obligations as set forth in the Wage Motion in the ordinary course of business.

E. **The Joint Administration Motion**

29. The Encore Debtors have also filed a motion requesting the joint administration of their Chapter 11 cases for procedural purposes only. The Encore Debtors are affiliates of the other Debtors whose cases are being jointly administered under *In re New Louisiana Holdings, LLC, et al.*, Case No. 14-50756, because each of the Encore Debtors is owned by an entity that

directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of one or more of the other Debtors. I believe that the rights of all parties in interest will be enhanced by the reduction in costs resulting from joint administration, and that all parties in interest will benefit from the efficiencies realized from procedural joint administration of the Bankruptcy Cases.

F.   **The Cash Collateral Motion**

30.   Prior to the Petition Date, the Encore Debtors conducted a lien search to determine which entities asserted a lien on the Encore Debtors' "cash collateral". The lien search revealed the liens filed by the Prepetition Lender, as well as a lien filed by US Foods, Inc. ("US Foods").

31.   However, the Encore Debtors do not believe that the Prepetition Lender's liens constitute duly perfected, non-avoidable liens against the Collateral because, among other things, the limitations period has expired. Furthermore, the Encore Debtors are investigating the validity, priority and extent of US Foods' purported lien.

32.   Notwithstanding the foregoing, to the extent that the Prepetition Lender and US Foods' liens and claims are valid, the Encore Debtors' cash may constitute "cash collateral," as such term is defined in Section 363(a) (the "Cash Collateral"). The Encore Debtors collect accounts receivable and use those funds to meet operating expenses related to the Facilities.

33.   In order to continue to operate and to preserve the value of the Facility, Fort Myers will be required to use and disburse Cash Collateral during the pendency of its bankruptcy case. Absent use of the Cash Collateral, Fort Myers will be forced to terminate its operations which will create a hardship on current residents as well as destroying any value for creditors. Specifically, Fort Myers requires use of Cash Collateral to pay wages, maintenance expenses, utility expenses, rent and insurance premiums related to the Facility, among other things. A

budget reflecting necessary disbursements anticipated through June 26, 2015 is attached to the Cash Collateral Motion as **Exhibit A** (the "Budget").  The Encore Debtors request the authority to use Cash Collateral in accordance with the Budget pursuant to Section 363(c).

34. As adequate protection against any post-Petition Date erosion of the Cash Collateral within the meaning of Sections 361 and 363, the Encore Debtors propose to grant the Prepetition Lender and any other party asserting an interest in Cash Collateral replacement liens in all after-acquired collateral to the same extent, priority and validity as such creditors existing liens existed on the Petition Date.  Such creditors are additionally protected by the preservation in the going concern value of the business as a result of the proposed use of Cash Collateral.

35. Fort Myers has an urgent and immediate need to utilize Cash Collateral to continue to operate and maintain the Facility.  Absent immediate authorization from the Court to utilize Cash Collateral, as requested, on an interim basis pending a final hearing on the motion, I believe that the Encore Debtors will be immediately and irreparably harmed.

36. I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 21, 2015         */s/ Raymond Mulry*
                              Raymond Mulry
                              Designated Officer

# EXHIBIT A

